Grover Glen Goe v. Commissioner.
Goe v. Commissioner
Docket No. 20486.
United States Tax Court
1951 Tax Ct. Memo LEXIS 270; 10 T.C.M. (CCH) 307; T.C.M. (RIA) 51096; April 4, 1951
R. J. Cleary, Esq., Farmers Bank Bldg., Pittsburgh, Pa., for the petitioner. A. W. Dickinson, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This case involves deficiencies in income taxes and fraud penalties for the years 1937 to 1945, inclusive, as follows: Year
Deficiency
Penalty
1937
$1,187.94
$ 596.89
1938
1,453.25
728.24
1939
859.95
436.83
1940
2,508.80
1,296.02
1941
4,792.76
2,396.38
1942
2,935.40
1,467.70
1943 *
2,381.11
850.21
1944
4,509.79
2,254.90
1945
8,229.54
4,114.77
Totals
$28,858.54
$14,141.94
*271 The issues are (1) whether respondent erred in including in gross income each year certain amounts which he determined as "other income"; (2) whether petitioner is entitled to personal exemptions disallowed by respondent each year; (3) whether a loss was sustained in 1945 on certain stock; (4) whether any part of the deficiency determined each year is due to fraud with intent to evade tax; and (5) whether assessment of the deficiencies for the years 1937 to 1942, inclusive, is barred by the statute of limitations. The returns of petitioner for the taxable years were filed with the collector for the twenty-third district of Pennsylvania. Findings of Fact The facts set forth in a stipulation are found as therein agreed to. Petitioner, a resident of Pittsburgh, Pennsylvania, was an employee of the National Tube Company, Pittsburgh, Pennsylvania, continuously from 1913 to 1945, inclusive. Until 1921 he was a buyer of supplies at annual salaries, payable semimonthly, ranging from $1,430 to $4,332 and thereafter, until 1925, chief clerk at yearly salaries ranging from $4,332 to $7,200, and since 1925, purchasing agent at annual salaries ranging from *272 $8,600 to $13,200, payable monthly. The total salary paid to 1937 was $155,463. In addition thereto petitioner received bonuses of the total amount of $7,733. The total gross salary paid to him thereafter through 1945 was $108,333 and the net, after deductions including $6,398 for income taxes and $1,500 for Government bonds, was $98,027.08. Petitioner maintained a checking account in the South Side Trust Co., Pittsburgh, Pennsylvania, from 1912 until November 1, 1932. From August 15, 1913, to November 1, 1932, petitioner received pay checks from the National Tube Co. aggregating in amount $114,531.54, of which he deposited $68,566.14 in the checking account. He has no records of his withdrawals, including cash, from the account. In 1924 and 1926 petitioner deposited in the account $2,738.34 and $4,750, respectively, as proceeds of sales of real property. Petitioner opened on February 14, 1929, and maintained until September 19, 1931, a checking account in the Bank of Pittsburgh N.A. During 1929, 1930, and 1931 petitioner withdrew from the account the total amount of $2,895 for cash, $3,851.77 to pay interest, $25,499.97 for investment purposes, $15,000 to repay loans, $900 to *273 loan, $1,056.75 to pay club expenses and $971.60 to pay miscellaneous charges. Petitioner maintained no record of what he did with the cash withdrawals. The $15,000 payment was paid in 1931 and represented the balance due on a bank loan made by petitioner in 1929 in the amount of $22,500 or $27,500. Petitioner maintained a checking account in the Union Trust Co., Pittsburgh, Pennsylvania, from 1931 to 1945, inclusive. From July 1932 until the close of 1936 he deposited in the account a total of $14,974.77. During the years 1937 to 1945, inclusive, petitioner deposited the following aggregate amounts, including currency, in the account: Number of
Total
Total
deposits of
deposits of
Year
deposits
currency
currency
1937
$ 32,808.18
5
$ 8,490.00
1938
24,252.64
9
10,950.00
1939
21,640.12
9
5,790.00
1940
12,706.09
12
10,490.00
1941
12,826.81
13
11,600.00
1942
8,888.91
5
6,050.00
1943
4,020.00
3
3,650.00
1944
8,600.00
5
8,600.00
1945
19,416.18
4
14,510.00
Total
$145,158.93
$80,130.00 None of the deposits of currency was cash retained by him out of salary checks received during the same year. Other amounts of the *274 total deposits were from the following sources: 1937
$24,358.18
Sale of securities
1938
2,962.08
Proceeds of bank loan
9,760.32
Sale of securities
1939
8,000.00
Proceeds of insurance
5,667.57
Sale of securities
1942
2,688.91
Sale of securities
1945
4,906.18
Proceeds of insurance
During 1931 to 1945, inclusive, petitioner withdrew the following amounts from his checking account at the Union Trust Co. for the purposes shown: Investments
Investments
Automobile
Year
(Misc.)
(Oil Vent.)
Cash
Taxes
Insurance
Expense
1931
$10,060.28
$ 16.80
1932
$ 350.00
54.20
1933
1,812.75
267.50
$ 337.56
$ 20.00
1934
960.00
332.36
751.50
1935
1,575.50
1936
3,900.25
1,050.00
231.20
544.50
1937
14,465.00
$ 1,600.00
2,600.00
478.56
172.48
750.00
1938
6,125.00
28,025.00
1,050.00
413.40
1939
16,199.90
1,350.00
271.10
410.04
821.20
1940
75.00
564.30
239.90
1941
717.00
647.50
1,900.00
698.74
741.00
1942
1,600.00
1,892.95
1943
825.00
650.00
1,716.76
1944
750.00
1,250.00
2,360.69
1945
14,407.20
600.00
1,942.64
$55,597.98
$46,547.55 *
$12,667.50
$11,009.06
$ 1,073.62
$ 3,679.20
*275 Club
Payments
Contri-
Year
Expenses
Interest
on loans
utions
Miscellaneous
1931
$ 156.65
$ 158.80
1932
530.91
239.12
1933
306.76
$ 10.00
206.35
1934
140,00
1935
25.00
1936
500.00
1937
$ 500.00
403.85
1938
$37.50
1939
487.92
3,000.00
50.00
1949
480.00
8,350.67
25.00
334.21
1941
1,887.47
1942
1943
3,986.81
1944
1,200.79
1945
1,893.00
$ 994.32
$ 1,005.42
$11,850.67
$ 110.00
$10,970.40
Included in the amounts as "Miscellaneous" are checks drawn in favor of the Claridge Hotel for hotel expenses, the amounts being $334.21 in September 1940, $537.45 between July 10 and 15, 1941, and $1,220.79 between August 2 and 16, 1944. Charges to the same account include $300 for jewelry given to an unnamed person, $225 for a set of furs presented to a lady friend and $249 for wearing apparel purchased at the Town & Travel Wear, a woman's shop, located in the Waldorf Astoria, New York City, as gifts to two lady friends. During the years 1933 to 1945, inclusive, petitioner maintained a checking account in the Farmers *276 Deposit National Bank of Pittsburgh in which he made deposits totaling $29,975.71 through 1936 and the following amounts thereafter: 1937
$ 8,868.28
1938
8,980.63
1939
8,364.16
1940
8,125.00
1941
9,958.60
1942
9,594.50
1943
7,519.85
1944
8,197.00
1945
8,917.80
Total
$78,525.82 Of the salary checks, totaling $40,096.38, which petitioner received from the National Tube Co. from December 1, 1932, to the close of 1936, petitioner deposited $24,357 in the account and retained the remaining amount of $15,737.38. During the taxable years the salary checks received, the amount thereof deposited in the checking account and retained by petitioner were as follows: Salary checks
Year
received
Deposited
Retained
1937
$11,559.00
$ 7,700.00
$ 3,859.00
1938
10,933.00
7,321.16
3,611.84
1939
11,479.00
7,600.00
3,879.00
1940
11,664.00
8,000.00
3,664.00
1941
11,664.00
8,867.00
2,797.00
1942
11,666.00
8,934.50
2,731.50
1943
9,499.70
7,519.85
1,979.85
1944
9,495.58
7,915.00
1,580.58
1945
10,066.80
8,767.80
1,299.00
Total
$98,027.08
$72,625.31
$25,401.77
During the period from July 13, 1933, through 1945 *277 petitioner made the following withdrawals from his checking account in the Farmers Deposit National Bank for the purposes shown: Rent and
Garage
Insurance
Club
Contri-
and
and
Year
Meals
Auto Exp.
Taxes
Interest
Expense
butions
Miscellaneous
1933
$ 306.98
$ 416.18
$106.49
$ 192.35
$ 104.35
$ 23.50
$ 249.93
1934
1,241.32
629.36
926.27
368.90
130.00
588.35
1935
1,358.44
687.17
176.82
847.36
431.17
5.00
2,135.18
1936
1,489.66
561.50
217.30
641.73
380.89
33.00
1,060.06
1937
1,627.81
672.76
670.66
467.21
120.50
1,852.15
1938
1,808.14
588.37
34.56
769.24
499.29
40.00
1,709.65
1939
1,971.59
669.92
47.82
354.35
400.00
70.00
1,231.28
1940
1,937.30
531.17
24.55
488.46
422.68
52.00
1,233.34
1941
2,077.13
1,168.75
30.45
652.01
399.01
115.00
1,371.96
1942
2,196.64
261.38
20.27
661.95
408.77
170.00
1,778.31
1943
2,379.63
70.00
23.59
733.93
290.81
85.00
2,047.98
1944
2,626.37
222.77
12.25
547.50
418.38
243.00
1,162.46
1945
2,887.96
12.00
576.98
458.54
170.00
1,005.47
$23,908.97
$6,491.33
$694.10
$8,062.79
$5,050.00
$1,257.00
$17,426.12
*278 For
For
Year
Mrs. Goe
daughter
Total
1933
$ 1,371.29
$ 29.80
$ 2,800.87
1934
2,753.63
305.19
6,943.02
1935
2,886.66
95.95
8,623.75
1936
3,297.43
41.44
7,723.01
1937
3,251.63
218.13
8,880.85
1938
2,813.65
889.97
9,152.87
1939
2,300.51
959.65
8,005.12
1940
2,625.84
967.19
8,282.53
1941
2,568.98
1,035.65
9,418.94
1942
2,384.12
853.75
8,735.19
1943
2,229.12
56.87
7,916.93
1944
2,432.38
769.30
8,434.41
1945
2,193.47
121.50
7,425.92
$33,108.71
$ 6,344.39
$102,343.41
In addition to salary, petitioner reported other income, consisting of interest, dividends and profits from oil syndicates, during the taxable years, as follows: 1937
$1,060.44
1938
826.47
1939
1,550.00
1940
808.54
1941
818.39
1942
$ 842.66
1943
825.02
1944
648.21
1945
648.65
Petitioner had a safe deposit box at the Union Trust Co. during the taxable years, during which he was granted access to it four times in 1937, seven times in 1938, twice in 1939, once in 1941, three times in 1942, twice in 1943 and six times in 1945. Certain dates of access and dates of deposit of currency in the account at the Union *279 Trust Co. coincide and with the amount deposited, are as follows: Date
Deposit
September 22, 1938
$5,000
September 22, 1938
200
March 13, 1939
700
November 8, 1945
6,700
December 12, 1945
3,920
Petitioner had dealings in stocks commencing about 1915, some, until the early twenties, by marginal transactions. Petitioner did not keep a set of books showing his income and expenses, or records of any amount saved out of cash retained from his salary checks. His records of income and expense consisted of check books, cancelled checks and bank deposit slips. He received a gift of $2,000 from his mother at some undisclosed time prior to her death in 1932 or 1934. In May 1946, when a special agent and revenue agent commenced an investigation of petitioner's returns for the years 1942 to 1945, inclusive, petitioner was requested to produce the checks and records to support his returns for those years. The investigators had been informed prior thereto that petitioner had a bank account in addition to the one in the Farmers Deposit National Bank. In response to the request he produced certain records, including statements and cancelled checks relating to his checking *280 account in the Farmers Deposit National Bank, but not including statements or checks relating to his checking account at the Union Trust Co. Upon being asked whether the Farmers Deposit National Bank was the only place where he did his banking petitioner replied that it was the only place. Records of his checking account at the Union Trust Co. were furnished representatives about June 18, 1946. In June 1947 petitioner testified before the special agent and revenue agent that at the time of the interview in May 1946, he did not disclose to them that he had a checking account at the Union Trust Co. and that knowledge by him that they knew he had the account was obtained from an official of the bank. In his determination of the deficiencies respondent included the amount of the deposits of currency in the account on the Union Trust Co. in gross income of petitioner as "other income". Petitioner and his wife were not getting along well living together in 1932 and even though their relations with each other at that time were "friendly", they agreed to and did thereafter through the taxable years live apart. Petitioner during the taxable years resided at the Fairfax Apartments in Pittsburgh, *281 Pennsylvania, until 1943 and there-after at the Schenley Apartments in the same city, while his wife resided at 1442 Alabama Avenue, Dormont, Pennsylvania. Their daughter, born April 29, 1920, resided at 1442 Alabama Avenue during the taxable years 1937 to 1943, inclusive. The relationship between petitioner and his wife after the separation was "friendly", and petitioner kept in contact with her and their daughter. When the daughter was not in college in Grove City or away for other reasons, petitioner saw her every week, on which occasions he generally took her out to dinner. While she was in Grove City, he visited her once every week or two weeks. Petitioner treated his daughter and she treated his counsel and advice in the same manner each would have, to the extent possible, had they been living at the same residence. The daughter was married in 1944. Until then petitioner supported her and his wife at the 1442 Alabama Avenue address and thereafter through 1945 supported his wife at the same place. The income tax return filed by petitioner each taxable year on the cash basis of accounting included income and deductions of his wife. He prepared his own returns from work sheets *282 on which he listed in detail income and deductions of himself and wife. Only the name of petitioner appeared in the space provided in the returns, made on Form 1040, for inserting the name of the taxpayer. Petitioner's wife did not sign any of the returns. In the returns for 1937 to 1940, inclusive, petitioner reported that the income and deductions of himself and his wife were included therein. In his returns for 1941 and 1942 petitioner gave no answer to the question, "If a separate return was made for the current year, state:" appearing therein. The word "No" was inserted in response to a like question appearing in the return for 1943. In the returns filed for 1937 to 1942, inclusive, petitioner inserted "1442 Alabama Avenue, Dormont, Penn." as his address. The "Schenley Apts." was given as his address in returns for the subsequent taxable years. The address given in the returns for 1937 to 1940, inclusive, was inserted with knowledge that he was not living with his wife at that address. Petitioner claimed personal exemptions during the taxable years and gave his status for the exemptions, as follows: Exemp-
Year
tions
Status
1937
$2,500
Married and living with wife. [1]
1938
2,500
Married and living with wife.
1939
2,500
Married and living with wife.
1940
2,000
Married and living with wife.
1941
1,500
Not shown.
1942
1,200
Head of family with explana-
tion "Wife, no income."
1943
500
Married and not living with
wife, and not head of family. [2]
1944
500
No exemption claimed for
wife. [3]
1945
500
No exemption claimed for
wife. [3]
*283 In 1937 and 1938 petitioner claimed $400 and $133.33, respectively, as a credit for dependents, his daughter being listed as a dependent. In his determination of the deficiencies respondent allowed the credits for dependents and allowed petitioner personal exemptions of $1,000 for each of the years 1937, 1938 and 1939; $800 for the year 1940; $750 for 1941; and $500 for each of the years 1942 to 1945, inclusive. In 1937, 1938 and 1939 petitioner invested a total of $45,509.90 in oil leases. Thereafter the leases were transferred to the Pitt-Venengo Oil Co., a corporation, and petitioner received in 1939 for his interest in the leases 46,000 shares of preferred stock and a like number *284 of shares of common stock of the corporation. In April 1942 a receiver was appointed for the operation of the corporation. The liabilities of the corporation at that time were about $70,000. The assets in the hands of the receiver were appraised in October 1942 at a value of $67,000. At that time the court authorized the receiver to operate the properties of the corporation and, if necessary, to borrow money on receiver's certificates. On April 24, 1943, October 29, 1943, May 29, 1944, and November 9, 1944, the court extended the receivership as being for the best interests of creditors and stockholders, the last extension being until December 31, 1945. On June 20, 1944, the receiver notified the corporation's stockholders that as things appeared to him at that time their investment in stock of the corporation was a total loss, but stated also that the long-term outlook for the stockholders appeared to be satisfactory, and that, in his opinion, if about 25 cents on the dollar additional investment was made, the average daily oil production could be doubled, to thirty barrels, and the company could be put on a dividend-paying basis. On November 28, 1944, the court authorized the receiver *285 to borrow $6,500 for installation of equipment. In March 1945 when the indebtedness of the receiver was about $67,000, consisting of a mortgage entered into in 1939 and judgments obtained not later than 1943, exclusive of labor claims amounting to $2,500, the court, upon application of the receiver, authorized sale of the oil properties of the corporation for $40,000 and ordered that the corporation be liquidated. The final account of the receiver, showing about $29,000 in his hands for distribution, was confirmed by the court in October 1945. About January 1946 all of the assets in the hands of the receiver were distributed to creditors of the corporation. No agreement was ever entered into by petitioner with the Commissioner to extend the statutory period for assessment of income taxes for the years 1937 to 1942, inclusive. Petitioner executed the consents for assessment of income taxes for 1943 and 1944 until June 30, 1949. The deficiency notice forming the basis of this case was mailed to petitioner on July 2, 1948. The returns filed by petitioner for the taxable years were false or fraudulent with intent to evade tax; and the deficiencies for each taxable year were due to *286 fraud with intent to evade tax. Opinion The petitioner did not keep books to record his income. Respondent in examining petitioner's returns for the taxable years, in the absence of adequate records, resorted to an analysis of petitioner's bank accounts. During the course of the examination, respondent discovered deposits of currency each year, the amounts of which, without proof acceptable to him that they were not taxable income, were included in gross income as unexplained bank deposits. Respondent admits that he does not know the source of the currency deposits. Petitioner contends on brief that, without more, currency deposits do not constitute taxable income. Moreover he insists that for the years 1937 to 1942, inclusive, (for which years assessment of the deficiencies is barred by the statute of limitations unless, as alleged by respondent, the returns for those years were fraudulent, with intent to evade tax) the burden of proof was on respondent to prove that the amounts are taxable income. No contention is made that respondent acted arbitrarily. Obviously he did not so act, for the deficiencies were not determined until after petitioner had been afforded opportunity, *287 not alleged by petitioner to have been inadequate, to reveal the source of the money for tax purposes. It is well settled that unexplained bank deposits are evidence of receipt of taxable income and that when the amount thereof is included in income by the Commissioner, the burden is on the taxpayer to overcome the presumptive correctness of his action. Russell C. Mauch, 35 B.T.A. 617, affd. 113 Fed. (2d) 555; Joseph Calafato, 42 B.T.A. 881, affd. 124 Fed. (2d) 187; Hoefle v. Commissioner, 114 Fed (2d) 713; Estate of Hague v. Commissioner, 132 Fed. (2d) 775; Louis Halle, 7 T.C. 245, affd. 175 Fed. (2d) 500. Petitioner alleged in the petition, verified by him, that the currency deposits were made from proceeds of sales of securities and from cash on hand or in his safe deposit box. At the hearing herein he stated as his position that the deposits were made out of cash retained from salary checks and savings in cash out of various transactions over a period of about 32 years. On brief petitioner does not ask for a finding on or make any specific contention as to the source *288 of the deposits for tax purposes. As to the years 1937 to 1942, inclusive, he confines his discussion to alleged weakness of respondent's proof and as to the other years, limits his remarks to a mere statement that based upon the entire record and his proposed findings of fact, he has met his burden of proof. We are asked to find as a fact that petitioner started to build a "cash reserve" in 1913 or 1914 and thereafter through 1945 saved about $68,000 out of cash retained from salary checks and, in addition, saved $800 prior thereto, and that petitioner received a gift of $2,000 from his mother. The record contains no showing as to date of such gift, except that it was sometime before her death in 1932 or 1934. We are also requested to find that other cash, the amounts not being specified, was placed in the "cash reserve." The petition alleges that petitioner saved and placed in his safe deposit box from prior to 1913 through 1945, the total amount of $76,500, including $10,800 cash withdrawn during 1937 to 1945, inclusive, from his Union Trust Co. account. Of that amount it is alleged that $52,000 was saved out of salary to 1936, inclusive. In addition thereto, petitioner alleged *289 that he placed in his safe deposit box prior to 1937 about $7,000 out of sales of real estate between 1924 and 1926, between $15,000 and $20,000 out of salary checks received during the taxable years, some part of (1) the excess of about $9,000 of deposits during 1926 and 1927 in his account at the South Side Co. over his salary in those years, and (2) about $25,000 out of proceeds of sales of securities from 1928 to 1936, inclusive, also a portion of proceeds of sales of stock to 1925, and cash withdrawals of about $21,000 between 1913 and 1925 from his account in the South Side Trust Co. He also alleged that only a small amount of the savings placed in the box was removed for living expenses. The statements made by or on behalf of petitioner infer that his present position is that the deposits in question were made out of savings and non-income placed in his safe deposit box. Petitioner was the only witness on his behalf, other than character witnesses and the special agent who examined his returns. His self-serving testimony is contradictory and inconsistent and considered with his demeanor on the witness stand lacks probative value in many respects. Petitioner's alleged desire *290 to maintain a "cash reserve" is based upon a fear of "being broke," a feeling, according to his testimony he had in 1914, which "came into being again in 1932." The petition in twenty separate paragraphs thereof alleges that the money in his "cash reserve" was kept in a safe deposit box rented, to the best of his knowledge, in 1915, no other receptacle being mentioned. At the hearing he testified that the cash was kept in the box and in an office safe since about 1914; that cash withdrawn from bank accounts for his "cash reserve" was placed in the box or safe, generally in the latter; that cash retentions out of salary checks received during the taxable years were placed in his office safe; and that the "greater portion" of the currency deposits made in 1937 were in the office safe at the close of 1936. If, as petitioner testified, an office safe was used since 1914 to store some of the accumulations of currency, he would have known about it when he verified his petition. We are unable to find from the evidence that any of the deposits in controversy came from an office safe. Neither are we able to find from the evidence in the case that the deposits were made from savings. His ability *291 to save such large amounts is based upon an assertion that he at all times lived very economically. The evidence fails to support the contention. A contrary mode of life is shown by his gifts of jewelry to an unnamed person and of furs and wearing apparel to lady friends and expenditures for hotel bills and club activities. To impress us with his frugality, he testified that his expenses were less after than before the separation in 1932. His testimony about the amounts saved out of his salary, commencing prior to 1912, and placed in his "cash reserve" is no more than an estimate. He first testified that he never had a record of his savings out of salary received between 1913 and 1945, inclusive, and then, on cross-examination, that his record of estimated savings of $60,000 to $70,000 by the year 1929 had been destroyed since then. We are not required to accept these estimates of an interested witness under the circumstances prevailing here. Burka v. Commissioner, 179 Fed. (2d) 483. The proceeds of sale of two parcels of real estate were, according to allegations in the petition, placed in the "cash reserve". The proof here is that the amounts were deposited in his *292 checking account. Petitioner borrowed $22,500 or $27,500 from a bank in 1929, when, according to his testimony he had at least $60,000 in his "cash reserve", and did not pay the debt in full until 1931. Other loans were obtained, as disclosed by payments thereof aggregating about $12,000 in 1937, 1939 and 1940. The evidence contains no explanation for borrowing money at interest at times when he allegedly had large amounts of cash on hand. Petitioner testified that the amounts deposited each year were owned by him on the close of the prior year and that none of the deposits each year came from retentions of salary checks received during that year, He did not testify how ownership was acquired other than the maintenance of a "cash reserve". Neither did he testify that he removed any of his alleged accumulations prior to 1937 for deposit or assign a reason for depositing some of it each year, commencing in 1937, as alleged by him. Petitioner did not at any time specifically testify that the deposits in question came out of his "cash reserve." Further discussion of the evidence is unnecessary. After considering it as a whole, and the demeanor of the petitioner as a witness, we are *293 unable to find that he saved any specified sum of money prior to or during the taxable years for accumulation in his alleged "cash reserve" or that he had such a reserve in an office safe and safe deposit box, or in either. The respondent was unable to ascertain the source of the money and the evidence before us does not reveal it. Under the circumstances, we must and do sustain the respondent on this issue for lack of proof of error. Petitioner claimed exemptions in 1937 to 1940, inclusive, as a married man living with his wife; in 1941, the maximum amount, without informing the Commissioner of his status for an exemption; in 1942, as head of a family; and in 1943, 1944 and 1945, one exemption of $500 for himself. In his determination of the deficiencies the respondent reduced the amount of the exemptions claimed prior to 1943 to the amount allowable for a married man not living with his wife and did not disturb the credits taken for exemptions in the subsequent years. Petitioner now contends that he is entitled to an exemption each year through 1943 as the head of a family and to two exemptions in 1944 and 1945. Respondent concedes on brief that petitioner is entitled to two exemptions *294 in 1944 and 1945. The applicable statutes contain no definition of the head of a family. Article 25-4 of Regulations 94, promulgated under the Revenue Act of 1936, reads, to the extent material, as follows: "ART. 25-4. Personal exemption of head of family. - A head of a family is an individual who actually supports and maintains in one household one or more individuals who are closely connected with him by blood relationship, relationship by marriage, or by adoption, and whose right to exercise family control and provide for these dependent individuals is based upon some moral or legal obligation. In the absence of continuous actual residence together, whether or not a person with dependent relatives is a head of a family within the meaning of the Act must depend on the character of the separation. If a father is absent on business, or a child or other dependent is away at school or on a visit, the common home being still maintained, the additional exemption applies. If, moreover, through force of circumstances a parent is obliged to maintain his dependent children with relatives or in a boarding house while he lives elsewhere, the additional exemption may still apply. If, however, *295 without necessity the dependent continuously makes his home elsewhere, his benefactor is not the head of a family, irrespective of the question of support. * * *" Regulations promulgated under revenue acts applicable to subsequent years are identical in all material respects. The regulations correctly interpret the statute. George A. Ohl, Jr. 45 B.T.A. 21. Petitioner contends that he comes within the terms of the regulations as to both his wife and daughter. The facts concerning the wife will be considered first. The statutes of Pennsylvania provide that: "If any man shall separate himself from his wife without reasonable cause, and, being of sufficient ability, shall neglect or refuse to provide suitable maintenance for his said wife, such wife shall be and is hereby empowered to bring her action, at law or in equity, against such husband for maintenance, * * *." [Sec. 131, Title 48, Purdon's Penna. Statutes Annotated.] Petitioner appeared disinclined to testify as to the reason for the separation. Considerable questioning on cross-examination finally resulted in a statement from him that he and his wife were "not getting along well together, and decided *296 it was best to separate." Without more to show the basis for the understanding to live apart, we can not find that the wife had not, by her acts leading to the separation, forfeited her right to maintenance. If we were to assume that the separation was by mutual consent, under which a wife retains her right of support, In re Harper, 288 Pa. 52; 135 A. 617, there remains the matter of whether petitioner retained the right to exercise family control. Under the circumstances, petitioner has not shown that he was under legal or moral obligation to support his wife. To be entitled to an exemption as head of a family, there must be proof of a right to exercise family control. Sidney Williamson Kirtland, 39 B.T.A. 959; Lawrence W. Carpenter, 10 T.C. 64. No proof of a right to control or actual control was made here. Petitioner, on the showing made, was not the head of a family on account of his wife. The facts with respect to the daughter do not require a different result. Petitioner, except for the year 1942, never claimed in his returns that he was the head of a family. For the first four taxable years involved herein he represented *297 that he was living with his wife, and for the first two of those years claimed his daughter as a dependent. The claims so made are evidence that he had knowledge of the distinction, for tax purposes, between the head of a family and a married man living with his wife. For the year 1943, petitioner revealed to the Commissioner that he was not living with his wife and asserted that he was not the head of a family. These representations and conclusions of petitioner are evidence to be taken into account in deciding the issue before us. There is testimony in the record by petitioner to the effect that the control he exercised over his daughter and her treatment of his counsel and advice was no different than it would have been had they been living together. Yet he saw her only about once a week, and not so often when she was away in school or elsewhere, so that clearly the control could not have been the same as if they were living in the same home. However, if we were to give the testimony full weight, it would not be controlling. As already pointed out, under the regulations, the right to exercise family control, not the exercise of control, is one of the decisive factors. As above *298 seen, the terms of the separation are not disclosed by the evidence before us. The fact that the daughter was at all times important in the custody of the wife indicates that the arrangement resulted from agreement between husband and wife. A right to custody, obviously implies some right of control in the guardian. The daughter became an adult in 1941 (Sec. 601, Title 46, Purdon's Penna. Statutes Annotated) and no legal control was exercisable thereafter. It does not appear that petitioner visited her at the residence she occupied with her mother or that he had an understanding with his wife that he could see his daughter at that place. We find no proof of a retention by him of a right to exercise control over the daughter. Such evidence as there is before us indicates that the right was not retained. He had, after she became of age in 1941, no such right as, in the absence of a common home, would make him the head of his family. The daughter reached 17 years of age during the first taxable year involved herein and, except for the short period she was attending college at Grove City, resided with her mother at all times material. No evidence was offered to show that it was necessary *299 for the daughter to live continuously away from the residence of petitioner. The cases cited by petitioner contain distinguishing facts and for that reason do not control the answer here. Respondent committed no error in denying petitioner an exemption for the years 1937 to 1943, inclusive, as the head of a family. The difference between the parties on the question of loss on the Pitt-Venango Oil Company stock is, in effect, whether it was sustained in 1945, as alleged by the petitioner. The respondent on brief says, in substance, that the record indicates that if the investment was a loss at all it was a loss prior to 1945. The petitioner seeks to deduct $1,000 theerof, as capital loss. The deduction was not taken in the petitioner's return for 1945 and was not denied in the determination of deficiency for that year. It is set up for the first time in the petition and the allegation is by the respondent's answer denied. The liabilities of the corporation in 1942 exceeded the appraisal value of its assets and a receiver for the corporation was appointed. Liabilities were about $70,000 as against assets appraised at $67,000. On June 20, 1944, the receiver wrote the stockholders *300 expressing the view that their investment was a total loss, but that the long-term outlook appeared to be satisfactory and that in his opinion if about 25 cents additional on the dollar could be invested the company could be put on a dividend-paying basis. In 1945 the property was sold and the final account of the receiver was filed showing about $29,000 for distribution to creditors. Distribution thereof was made in 1946. A determination of the year in which stock becomes worthless must be made upon the evidence presented in the particular case. Mary S. Peabody, 38 B.T.A. 1086. It requires, inter alia, consideration not only of asset value but of earning power. Sterling Morton, 38 B.T.A. 1270. Neither bankruptcy nor receivership, though indication of worthlessness, establishes such. Jarvis, Trustee v. Heiner, 39 Fed. (2d) 361; Edward C. Lawson, 42 B.T.A. 1103; A. R. Jones Oil & Operating Co. v. Commissioner, 114 Fed. (2d) 642. Under all the facts here present, it seems to us that the identifiable event establishing loss was the sale of the properties in 1945, and that the petitioner was justified in not claiming loss *301 prior to that year. There was little preponderance of debts over liabilities at any time and the receiver's letter of June 20, 1944, discloses that Pitt-Venango was an operating oil company producing oil. The court which appointed the receiver continued the receivership from time to time, as in the best interest of creditors and stockholders, allowed the receiver to borrow money to purchase equipment, and to operate the company's oil business. Clearly there was a view that there was at least potential value, of interest to stockholders as well as creditors. We think that the petitioner could not have proven prior to 1945 that his investment was a total loss. On this issue we hold for the petitioner. Concerning the fraud penalty, the respondent had the burden of establishing by clear and convincing evidence that some part of the deficiency each year was due to fraud with intent to evade tax. The substance of the difference between the parties under the issue is whether respondent has met his burden. Petitioner, on brief, on this issue merely refers us to the entire record, particularly his proposed findings of fact, as showing the failure of respondent to meet his burden. No reply *302 brief was filed by petitioner even though an extension was given within which to prepare and file it. Petitioner and his wife separated in 1932, five years prior to the earliest taxable year involved herein, and at all times important thereafter petitioner lived in an apartment while his wife and daughter lived in the residence all of them occupied before the separation. Notwithstanding the fact that petitioner was living apart from his wife at a different address, in his returns for the years 1937 to 1940, inclusive, he claimed credit for the personal exemption applicable to a married man living with his wife. Petitioner admitted in the stipulation of facts that he and his wife resided at separate addresses and in his reply to the answer to the petition that he represented to the Commissioner in returns filed for 1938, 1939 and 1940 that he was living with his wife at the Alabama Avenue address given in the returns. He denied the like representation in his return for 1937 but the evidence here establishes the fact. The credit was claimed in the space provided therefor in the return. The explanation given by him was unnecessary, being required only in the event credit was claimed *303 as head of a family. Petitioner testified on cross-examination that when giving 1442 Alabama Avenue, Dormont, Pennsylvania, as his address in returns filed for 1937, 1938, 1939 and 1940, he knew he had not been living there with his wife for five or six years; that the personal exemption, as claimed by him, would reduce his tax liability; and that it would be natural for the Commissioner to conclude from the returns that petitioner was living with his wife at the address given by him. On redirect examination petitioner testified that he gave no thought to what the Commissioner would think about it, but recross examination developed that petitioner testified before a special agent and a revenue agent in 1947 that inasmuch as he was supporting his wife and daughter at the Alabama address, he "was justified in making the report appear that I was actually liying with my wife". It thus appears that when preparing his returns for the taxable years 1937 to 1940, inclusive, petitioner with fraudulent intent to evade income tax deliberately falsely represented that he was living with his wife. See John McKeon, 39 B.T.A. 813
As proof of the filing of fraudulent returns each *304 year with intent to evade tax, respondent, in addition to the personal exemptions claimed in the years 1937 to 1940, inclusive, relies upon petitioner's failure to include in gross income the deposits of currency in the Union Trust Co. account. Petitioner is a man of intelligence and for a long period of time has held a responsible position. The working papers for his returns for the taxable years display considerable attention to detail, inconsistent with the absence of any record of his alleged accumulation of large amounts of currency and lack of plausible explanation of the source of the deposits. Unexplained bank deposits, not reported as taxable income, are evidence of fraud. Oliver v. United States, 54 Fed. (2d) 48; Louis Halle, supra; Russell C. Mauch, supra; Abraham Wolf, 14 T.C. 751; Pincus Brecher, 27 B.T.A. 1108. Proof of fraud by direct evidence is seldom possible. It is generally found from surrounding circumstances, including the conduct of the taxpayer. M. Rea Gano, 19 B.T.A. 518; Wallace H. Petit, 10 T.C. 1253. Here petitioner deposited large amounts of currency in one *305 of his bank accounts during nine successive years without explaining a source other than one which, under the prevailing circumstances, we have declined to accept, as we may do. Joe Balestrieri & Co. v. Commissioner, 177 Fed. (2d) 867; Hoefle v. Commissioner, supra.The aggregate amount of the currency deposits is about 75 per cent of the net income reported by petitioner for the same period. Some of the evidence on the fraud question was referred to in connection with the income issue. Petitioner's testimony is to the effect that his alleged savings were kept, in part, at all times material, in an office safe, to which he alone had access. More than petitioner's unsupported testimony was necessary in the light of all of the evidence here, to establish exclusive use of an office safe. When first given an opportunity to do so, petitioner did not reveal that he had a checking account at the Union Trust Co. Knowledge that the tax authorities were aware of the existence of the account came to petitioner from an official of the institution. Such action on the part of petitioner indicates that he realized that the account contained unreported taxable income. *306 Petitioner alleged in his petition that $10,800 of his cash withdrawals from 1937 to 1945, inclusive, from the Union Trust Co. account was saved and placed in his safe deposit box and that between $15,000 and $20,000 of the cash retained out of his salary checks was placed in the box. During that period he made cash withdrawals of $11,000 and retained about $25,000 out of his salary checks. The reason for the withdrawals of cash is conflicting. He first testified that "It was probably ultimately returned to the bank," then, as to what he did with it, "I may have used it for one day, and not thereafter," immediately following which, he testified that the purpose of the withdrawals "was to keep a cash reserve, money in the office, or in a safe deposit box." While fear of going broke was the reason assigned by petitioner for his accumulations of cash in an office safe and safe deposit box, the evidence shows that currency was being deposited in the bank while, allegedly, other money was being accumulated for the "cash reserve". No attempt was made to explain the necessity or desirability of such procedure. We have only the testimony of petitioner that he accumulated large amounts over *307 a long period of time, and are not justified in accepting it under the circumstances prevailing here. If, as testified by petitioner, fear of going broke was the reason for hoarding money in a safe, why did he change his mind and put it in the bank during the taxable years, only a part in each year? No reason therefor is advanced. He made no effort to justify an investment of about $45,000 in oil leases, or earlier marginal tradings in stock, in considerable amounts, speculative ventures, in spite of that fear. The reported cases show that taxpayers charged with the filing of fraudulent returns rarely fail to advance some reason to defeat it. No tenable explanation was offered here for failure to report the currency in question in gross income. We conclude by holding from all of the evidence that respondent has met his burden of proving that the return each year was fraudulent with intent to evade tax. See Joseph Calafato, supra; Murray Humphreys, 42 B.T.A. 857, affd. 125 Fed. (2d) 340; Russell C. Mauch, supra; Abraham Wolf, supra. Petitioner having filed fraudulent returns with intent to evade tax, assessment *308 of the deficiencies for the years 1937 to 1942, inclusive, may be made at any time. Section 276 (a), Internal Revenue Code. Decision will be entered under Rule 50. Footnotes
*. Includes victory tax.↩
*. Error noted.↩
1. In the space provided for explanation of any claims made for exemption as head of a family, petitioner gave as reason for the credit, "Wife without income," and as the name of his dependent and her relationship, inserted her name and her relationship to him. ↩
2. As explanation in space provided for reason for credit as head of a family, petitioner inserted "Wife no income." ↩
3. In each return petitioner wrote "Wife no income" in space for use only in case the wife filed a separate return.↩